UNITED STATES v. ARMOUR & CO. et al.

(District Court, N. D. Illinois.  March 21, 1906.)

1. CRIMINAL LAW—IMMUNITY TO ONE FURNISHING EVIDENCE OR INFORMATION —STATUTES—CORPORATIONS.

A corporation, whether state or federal, cannot claim immunity from prosecution for violation of the interstate commerce or anti-trust laws of the United States because of testimony given or evidence produced by its officers or agents before the Interstate Commerce Commission or the Commissioner of Corporations, or in any proceeding, suit, or prosecution under such laws; the right to immunity on account of evidence so given in the several cases granted by Act Feb. 11, 1893, c. 83, 27 Stat. 443 [U. S. Comp. St. 1901, p. 3173], and Acts Feb. 14, and Feb. 25, 1903, cc. 552, 755, 32 Stat. 827, 904 [U. S. Comp. St. Supp. 1905, pp. 68, 602], being limited to individuals who as witnesses give testimony or produce evidence.

2. UNITED STATES—EXECUTIVE DEPARTMENTS—COMMERCE AND LABOR—CREA-
TION—STATUTES—CONSTRUCTION.

The primary purpose of Commerce and Labor Act February 14, 1903,
c. 552, 32 Stat. 825 [U. S. Comp. St. Supp. 1905, p. 63], was legislative,
to enable Congress by information secured through the work of officers
charged with the execution of that law to pass such remedial legislation
as might be found necessary, and the act must be construed in view of
such purpose.

3. CRIMINAL LAW—IMMUNITY TO ONE FURNISHING EVIDENCE OR INFORMATION—
STATUTES—HEARINGS BEFORE COMMISSIONER OF CORPORATIONS.

Section 6 of the act creating the Department of Commerce and Labor
(Act Feb. 14, 1903, c. 552, 32 Stat. 827 [U. S. Comp. St. Supp. 1905, p.
68]), defining the powers and duties of the Commissioner of Corporations,
requiring him to make investigation into the organization, conduct, and
management of the business of all corporations or combinations en-
gaged in interstate or foreign commerce, other than common carriers,
and giving him the same powers in that respect as is conferred on the
Interstate Commerce Commission with respect to carriers, including
the power to subpoena and compel the attendance of witnesses, and to
administer oaths and require the production of documentary evidence,
contemplates that he shall proceed by private hearings; and, having
such powers, a person who appears before him on his demand or by his
request, and gives testimony or produces documents, although not sworn,
is entitled to the same privileges and immunities as though his attendance
was compelled by subpoena and his testimony given under oath.

4. SAME.

Act Feb. 14, 1903, c. 552, creating the Department of Commerce and
Labor (32 Stat. 827 [U. S. Comp. St. Supp. 1905, p. 68]) by section 6 re-
quires the Commissioner of Corporations to investigate all corporations
and combinations engaged in interstate or foreign commerce, except
common carriers, and provides that "all the requirements, obligations,
liabilities, and immunities imposed or conferred by said 'Act to regulate
commerce' and by 'An act in relation to testimony before the Interstate
Commerce Commission' * * * shall also apply to all persons who
may be subpoenaed to testify as witnesses or to produce documentary evi-
dence in pursuance of the authority conferred by this section." The
act last mentioned (Act Feb. 11, 1893, c. 83, 27 Stat. 443 [U. S. Comp. St.
1901, p. 3173]), which is supplementary to the interstate commerce act,
provides that "no person shall be prosecuted or subjected to any penalty
or forfeiture for or on account of any transaction, matter or thing con-
cerning which he may testify or produce evidence, documentary or other-
wise before said commission or in obedience to its subpoena * * * or
in any such case or proceeding." Appropriation Act Feb. 25, 1903,
c. 755, 32 Stat. 904 [U. S. Comp. St. Supp. 1905, p. 602], making provision
for the enforcement of the interstate commerce and anti-trust laws,
contains a similar immunity provision relating to persons giving testi-
mony or producing evidence in any proceeding, suit, or prosecution under
said acts. By a resolution of the House of Representatives of March 7,
1904, the Commissioner of Corporations was directed to investigate the
so-called "Beef Trust," and while proceeding thereunder certain persons
by his request, but without being subpoenaed or sworn, furnished testi-
mony and documentary evidence on which he based his report. *Held*,
that the immunity provisions of the statutes set out and applicable to
such investigation, to be valid, must be construed as being as broad as the
privilege given by the fifth constitutional amendment, and that the per-
sons so furnishing evidence could not be prosecuted for violation of the
anti-trust law, on account of the transactions, matters, or things to which
such evidence related.

Criminal Prosecution. On motion by defendants and cross-motion
by the United States to direct a verdict on trial of pleas in bar.

On the 1st day of July, 1905, an indictment was returned by the grand jury
of the Northern division of the Northern district of Illinois against the de-

fendants, charging them with conspiring in restraint of trade and commerce among the states and with foreign nations, and with an attempt to monopolize such trade and commerce, in violation of the Sherman anti-trust act. Pleas in abatement were filed attacking the organization of the grand jury, and the procedure in general, from the time the grand jury was impaneled until it returned the indictment. A demurrer was interposed to these pleas, and on argument was sustained as to all of them. A demurrer was then interposed to the indictment itself, and after full argument it was overruled as to the conspiracy counts and sustained as to the counts charging monopoly. Later, on the 23d day of October, 1905, special pleas in bar were filed, setting up that by virtue of a resolution of the House of Representatives, adopted March 7, 1904, and known as the "Martin Resolution," and also by virtue of the law creating the Bureau of Corporations, James R. Garfield, Commissioner of Corporations, had made an investigation into the business of the defendants and into the matters and things alleged in the indictment, and that the defendants upon the lawful requirement of the Commissioner of Corporations had furnished evidence, documentary and otherwise, of and concerning the matters charged in the indictment. The pleas are numerous, and are varied in form, but the above is the substance of them. Replications were filed by the United States, traversing the averments of the pleas. A jury was impaneled, and the taking of testimony was commenced on the 29th day of January, 1906.

The resolution of the House of Representatives was as follows: "Resolved, that the Secretary of Commerce and Labor be, and he is hereby, requested to investigate the causes of the low prices of beef cattle in the United States since July first, nineteen hundred and three, and the unusually large margins between the prices of beef cattel and the selling prices of fresh beef, and whether the said conditions have resulted in whole or in part from any contract, combination, in the form of trust or otherwise, or conspiracy, in restraint of commerce among the several states and territories or with foreign countries; also, whether said prices have been controlled in whole or in part by any corporation, joint stock company, or corporate combination engaged in commerce among the several states or with foreign nations; and if so, to investigate the organization, capitalization, profits, conduct, and management of the business of such corporations, companies, and corporate combinations, and to make early report of his findings according to law." For the act establishing the Department of Commerce and Labor, passed February 14, 1903, see U. S. Comp. St. Supp. 1905, p. 63 (32 Stat. 825, c. 552). For the interstate commerce act and amendments thereto, portions of which are adopted and made part of the said act of commerce and labor, see Fed. St. Ann. vol. 3, p. 809 et seq. (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]; Act March 2, 1889, c. 382, 25 Stat. 861 [U. S. Comp. St. 1901, p. 3168]). For the act in relation to testimony, etc., being an act supplemental to the interstate commerce acts, passed February 11, 1893, see Fed. St. Ann. vol. 3, p. 855 (27 Stat. L. 443, c. 83 [U. S. Comp. St. 1901, p. 3173]). For the Sherman anti-trust act, being the act under which the indictment was returned, passed July 2, 1890, see Fed. St. Ann. vol. 7, p. 336 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]). For the act appropriating $500,000 for enforcement of the anti-trust and interstate commerce laws, etc., passed February 25, 1903, see 32 Stat. 904 [U. S. Comp. St. Supp. 1905, p. 602].

The resolution of the House of Representatives, set forth above, which is known as the "Martin Resolution," was passed March 7, 1904. Its passage, and the terms thereof, and the fact that the Commissioner of Corporations, Mr. James R. Garfield, was going to Chicago to make the investigation of their business thereby called for, were known to defendants from the public press. Their respective counsel thereupon investigated the law as to the powers and authority of the Commissioner of Corporations, under section 6 of the act creating that bureau (Act Feb. 14, 1903, c. 552, 32 Stat. 827 [U. S. Comp. St. Supp. 1905, p. 68]), to make such investigation and to compel the testimony of witnesses and the production of the books and records of the defendants for the purposes thereof, and advised defendants with respect thereto. Afterwards, on April 13, 1904, the Commissioner of Corporations arrived in Chicago for that purpose. He called upon Charles G. Dawes, president of the Central Trust Company of Chicago, and told him he had come

to Chicago to meet representatives of the packers and discuss with them this investigation, and stated his purpose in coming to Chicago to meet the representatives of the packing industries, and asked Mr. Dawes if he would introduce him to certain of the defendant packers and bring them together. He also called upon James H. Eckels, president of the Commercial National Bank of Chicago, and made a similar request. Accordingly Mr. Dawes arranged, and the Commissioner on that day had, an interview with Louis C. Krauthoff, general counsel of the Armour companies, who was authorized by his clients to meet the Commissioner, at which interview Mr. McRoberts, assistant treasurer of the Armour companies, and Mr. Dawes, were present; and Mr. Eckels in like manner arranged, and the Commissioner later on the same day held, separate meetings and interviews with Edward Swift, vice president of Swift & Co., with Edward Morris, vice president of the Fairbank Canning Company, and with Jesse P. Lyman, president of the National Packing Company.

At these interviews Mr. Garfield informed the defendants and their representatives whom he met that he was engaged in making this investigation as Commissioner of Corporations. He called to their attention the law creating his bureau and the powers thereby vested in him, and the Martin resolution of the House of Representatives, and informed them that he had come to Chicago to get from the defendants the information possessed by them, and access to their books and records, and called upon them to give him and his authorized agents such information and access. The Commissioner testified, as a witness for the government, that he had substantially the same interview with each of these persons; the interviews with Mr. Swift, Mr. Morris, and Mr. Lyman being, however, briefer than that with Mr. Krauthoff.

The substance of the interviews on April 13, 1904, were stated by the United States Attorney in his argument to the court upon these motions, as follows: "The Commissioner secured an introduction to them through their banker and through their mutual friend, Mr. Dawes and Mr. Eckels. He took the matter up with them as a business proposition, and said to them: 'I have come here now as Commissioner, and I wish to make an investigation, and I want you to co-operate with me. I want you to turn over this evidence. You know what my powers are, what my duties are. You know all about it.' 'Yes,' Mr. Krauthoff says, 'we are thoroughly posted on that.' He took or started to take the law from his pocket and hand it to them. Mr. Krauthoff says: 'We understand all about the law. * * * We know exactly what our rights are and we know what your rights are. * * * You need not discuss that Mr. Garfield. * * * Let us know what you want here.' Mr. Garfield said to him, and to the other gentlemen: 'I want to make an investigation. That means that I must go to your books and papers and find out what you have, and in order to make it thorough I must verify what is given to me by the books themselves.' He called for a complete investigation and examination of their affairs."

In these interviews, Mr. Garfield called their attention to the Martin resolution calling for the investigation, as well as to the act of Congress creating his bureau and the powers thereby conferred upon him, and produced the law, intending thereby to show what the powers of the bureau were, but was informed that the defendants were aware of the provisions of the law. He stated in the interview that by this Martin resolution the House of Representatives had indicated certain specific lines of inquiry that it desired made, and in connection with the general investigation he was taking up the Martin resolution in detail; and he stated that without the information to be obtained from the defendants and from their books and records his report would be incomplete. He stated that detective methods would not be used, but said he came and would come directly to headquarters for such information as he wished, and for that purpose had met these men. Mr. Krauthoff stated to him that the Department of Justice of the government had obtained an injunction against the defendant packers, enjoining them from violation of the Sherman anti-trust act; and Mr. Garfield testified that he stated in that connection that his department and bureau were not connected with the Department of Justice; that each department was operating separately, and that the work of the Bureau of Corporations was within its own de-

partment; that he was not acting with or for the Department of Justice. He testified that he stated practically to the effect that the purpose of Congress in creating his department was not to disclose violations of law or to investigate prosecutions, or to act in connection with any other department of the government, but was for the purpose of developing facts, so that they might be reported to the President, and by him to Congress, for legislative purposes. Mr. Garfield testified that, in stating to Mr. Krauthoff that his department had no connection or co-operation with the Department of Justice, his impression was that that question had to do with whether or not he was acting for the Department of Justice in the collection of information, or whether he was to turn it over to the Department of Justice, and that the statement as to the injunction and as to his connection with the Department of Justice had to do with that subject-matter; that he did not recall saying in this interview (as testified to for defendants) that, if it were known that his department was used in connection with or in assistance of the Department of Justice, it would be the destruction of the usefulness of his department, but that he had stated that, or words to that effect, in his official reports that the main object for which section 6 of the act creating the Department of Commerce and Labor was enacted was to report to Congress for legislative purposes; that he stated in the interview with Krauthoff, in connection with his statement as to the purposes of the bureau in the matter of this investigation, that he had conferences with the President and the Secretary of the Department, and spoke with their authority and consent.

The Commissioner testified that he stated to Mr. Krauthoff it would be his duty, under the law, to report the data gathered by him to the President as he might require, who, under the terms of the law, could make such parts public as he should direct; but that he appreciated that there were certain portions of the business of the defendants (private accounts and entries of their profit and loss accounts and of their detailed costs—trade secrets— which they would desire their competitors not to know) that were not the proper subject of public inquiry and should not be made public, and that such data would not be reported even to the President, and that this policy was understood and accepted by the Secretary of the Department, Mr. Cortelyou, and by the President; that Mr. Krauthoff asked him what use the President would make of the report made to him, and he told him as to that he could not answer. He could simply say the President would do what was right. He also testified that he had previously read a pamphlet of Mr. Randolph (being an opinion by Carmen F. Randolph on the status and powers of the Bureau of Corporations, organized under section 6 of the act of Congress creating the Department of Commerce and Labor), and had in mind, in talking with Mr. Krauthoff, that there was a line of privacy which, under the Constitution, Congress could not invade, and that the question as to his investigations invading that line was a matter for discussion between them; that he stated that, on the other hand, there was a great deal of material of a purely statistical character, as to which there would be no question that it would be available for the purposes of the investigation, and that as between those two classes of information or evidence (i. e., that to which the government would be clearly entitled and that to which it would not be entitled) a great many subjects might come up during the investigation as to which there would be question; that he said to the effect that the information in the possession of the defendant packers as to their business would divide itself into three classes, viz., that to which the government was clearly entitled in and for the purposes of said investigation, that to which it was clearly not entitled, and a third class as to which there might be doubt or question; that it was not his purpose to act arbitrarily in connection with those matters; that all matters concerning which inquiry might be made by his agents, and concerning which the packers had any doubt, would be taken up for conference, for determination as to whether or not the question was proper and whether or not the information should be given; that as to all those matters they would be referred to him for conference with the packers; that the determination would result from the conference.

Krauthoff, McRoberts and Dawes testified, in effect, that the statement of Mr. Garfield as to his connection with the Department of Justice was in re-

-sponse to the inquiry of Mr. Krauthoff as to whether any of the information that he might obtain from the defendants or their books would be used by the Department of Justice or for its purposes and against the defendants, and that Mr. Garfield said it would not be used for that purpose, and that any such use would be guarded against, and that such information would be used solely for the purposes of the Department of Commerce and Labor, and that the defendants were protected in that respect by the law as well as by the policy of the department. These witnesses also testified that the Commissioner said (and a number of other witnesses for defendants testified that he said to them) that he had the right and power to get this information by a hearing in the course of which the books of the defendants would have to be brought to him, but the information would be thereby obtained in an indirect and incomplete way. The evidence was that in such interviews Mr. Garfield presented a plan by which he said he desired to carry on the investigation in a way which would be deemed more efficient and thorough and of less inconvenience and interruption to the business of the defendants. He said that he wanted to get at the actual facts and in the best way, and for that purpose desired to get access to the books of the defendants and to get their -co-operation for the examination thereof in their own offices, which was the plan he proposed. He said that he could not attempt to do the work personally, but would have agents, men duly accredited, officers of the Bureau of Corporations, who were expert in making an investigation of this kind, to do the work; that he could not accept as final any statement made by the defendants from their books, but would require that the agents of the bureau go to the books and verify those statements, or any statements that might be made from the books of original entry themselves, for the reason that he desired, when his report was completed, to be able to say that the agents of the bureau had examined the books of the original entry. And a large number of witnesses for the defendants testified that in the interviews with the Commissioner, as well as with his agents upon the ground, the Commissioner and his agents referred to and asserted the power of the Commissioner, under the law, to compel the disclosures and testimony of the defendants and the production of their books and records.

At the interviews of April 13, 1904, between Mr. Garfield and the defendants, or their representatives, the defendants and representatives of defendants who took part in said interviews stated to Mr. Garfield that they would take up the matter with the defendants and report to him their conclusion. This was done, and the defendants thereupon consulted their respective counsel as to their legal duty and obligation to comply with the call of the Commissioner of Corporations so made for the disclosure as to their business and for the production of their books and records to the Commissioner and his agents, and were advised by their counsel with respect thereto, and acting upon such advice they reported to the Commissioner that they would comply therewith, and in furnishing information and access to their books and records they acted in accordance with that advice. On the 14th or 15th of April, 1904, the Commissioner brought to the offices of the respective defendants at the Union Stockyards in Chicago, Mr. Durand, a special agent of the Bureau of Corporations, and introduced him to certain of the defendants, officers of the defendant corporations, and stated that Mr. Durand would be in charge of the investigation in Chicago with the authority of the Commissioner to represent him. Thereupon, a few days afterwards, Mr. Durand, with the authority of the Commissioner, presented to the officers of Armour & Co., Swift & CO., and the Fairbank Canning Company written memoranda of the information which he desired from the defendants and from their books and records at that time. These memoranda were first presented to officers of Armour & Co. and to officers of Swift & Co., and were taken up, respectively, by the officers of these companies among themselves and with Mr. Durand, and by an officer of Armour & Co. with Mr. Garfield at Washington, upon certain questions as to the scope of the inquiries and as to whether certain specific parts of the information called for was within and pertinent to the investigation; and, these questions being determined, special agents of the Bureau of Corporations were given access to the books and records of those companies containing such information, and a few days later, upon

presentation of similar memoranda to the officers of the Fairbank Canning Company, the agents of the bureau also commenced the investigation of the books and records of that company and were given like access thereto. A little later Mr. Robertson, a special agent of the bureau, by the direction of the Commissioner, went to Omaha and applied to the defendant officer of the Cudahy Packing Company and called for access to the books and records of that company for similar information, and this call or request was complied with by Mr. Cudahy; and also by like direction and authority said Robertson went to the office of the Armour Packing Company in Kansas City, and made a similar call or request of that company, and this call was complied with, and access to the books and records of that company given by the direction and authority of Mr. Charles W. Armour, president of that company and vice president of Armour & Co. The investigation continued in the offices of the defendants at Chicago until January 28, 1905, and from time to time at intervals afterwards during the spring and early summer of 1905. In the meantime other communications in writing, signed by the Commissioner, for additional information according to memoranda thereof accompanying the letters, were presented to the defendants, and (after the disposition of objections by certain of the defendants to portions of the information) the information was furnished by the defendants so far as required by the Commissioner. This information was of the facts of costs, expenses, selling prices, and proceeds, and other facts and data from which the Commissioner and his experts were enabled to determine the costs, expenses, selling prices, and margin of profits of the respective defendants in the dressed-beef business, and also information as to the organization, conduct, and management of their business, and much information as to the other branches and departments of their business.

The agents of the bureau also investigated the books of divers subsidiary corporations of the National Packing Company, in compliance with the interview and call of the Commissioner of Corporations therefor with and upon the president of that company, Mr. Lyman, on April 13, 1904, and by and with the authority and direction of the board of directors of that company acting under advice of counsel; and the counsel of that company, at the request of the Commissioner addressed to that company, made a statement of information as to the organization of that company. On January 28, 1905, the Commissioner addressed communications to Armour & Co., Swift & Co., and the Fairbank Canning Company (or Morris & Co., the owners of the Fairbank Canning Company), in which he requested further information "which can best be secured in the form of a written statement to be drawn up on the basis of oral interrogatories of an informal character," and stated that Special Examiner Durand was authorized to address to the proper representatives of those companies questions covering the subjects mentioned in the letter, which were: History, ownership, and organization of the National Packing Company; ownership of the securities of the defendant companies whose representatives should be examined; relation of those companies and stockholders to subsidiary corporations and other corporations connected with the packing business or cattle industry; methods of competition in the purchase of cattle and the sale of meat products; control of the large packers over the prices of live stock and of meat products; relation of the prices of cattle and the prices of beef, and the causes affecting them; cost of killing cattle and of handling the products thereof; capital stock, bonds, total sales, earnings, and dividends of the companies whose representatives should be examined; names of private car lines controlled by those companies or their stockholders; the number of cars owned or operated, the mileage made and the cost of operation. And the letter of the Commissioner stated that statements in reply to such interrogatories would be taken down by a stenographer and recast in systematic form by Mr. Durand and submitted to the representatives of the defendant companies for revision, signature, and authentication by oath or affirmation; and if it should then be found necessary to supplement the affidavit in any way Mr. Durand would address inquiries to other representatives in the same manner. Upon Mr. Durand taking up this matter separately with representatives of the different companies addressed, Mr. Durand testified that counsel for one of the companies, to whom certain of the questions to that company were referred, declined to answer certain of those questions

under oath or to advise his clients so to do; the evidence as to such refusal and as to the extent and scope thereof and the reasons therefor being conflicting. This being reported by Mr. Durand to the Commissioner, Mr. Durand was instructed by the Commissioner to take all such statements without oath, and he did accordingly examine divers of the defendant officers of the companies orally, but without administering or requiring any oath, and took down and transcribed and submitted to them the statement of their answers for revision, and these statements, being revised and approved, were taken and transmitted by him to the Commissioner of Corporations.

On February 28, 1905, the Commissioner of Corporations, having reached the results of his investigation for the purpose of a report thereof as required by the Martin resolution, came to Chicago with Mr. Durand and called upon the defendants to produce their books showing their profit and loss accounts and the results of their business, for the purpose of comparing therewith and checking the computation of the profits and results of their business at which he and his expert statisticians had arrived. This was complied with by the defendants, and the books and records showing the profits of their business and of the different departments thereof were produced to and examined by the Commissioner and Mr. Durand. Thereupon the Commissioner completed and submitted his report of March 3, 1905, entitled "Report of the Commissioner of Corporations on the Beef Industry," which was transmitted by the President to Congress on that day and published, and is referred to in and made a part of the special pleas herein. The report is accompanied by the letter of the Commissioner stating that it is a report made under the direction of the Secretary of Commerce and Labor, "and upon that portion of the resolution of the House of Representatives adopted March 7, 1904, having to do with the prices of cattle and dressed beef, the margins between said prices, and the organization, conduct, and profits of the corporations engaged in the beef packing industry." The evidence showed that the printed report of the Commissioner of Corporations was used by the United States Attorney before the grand jury which found the indictment herein, in examining a witness as to certain of the subsidiary companies of the National Packing Company.

Commissioner Garfield also testified that certain matter containing tables compiled by Special Examiner Durand, under his direction, from information obtained from the books and records of the defendants in the course of such investigation, showing the numbers of cattle, hogs, and sheep from time to time purchased and killed at the various stockyards by the different defendant companies, which made up an additional chapter of his report upon the evidence of a combination between the packers, but which was not included in his published report, were on October 17, 1905. by the direction of the President, turned over by him in his office to Mr. Pagin, an assistant to the Attorney General, who came to the office of the Commissioner by appointment through the Attorney General, and at his direction, to be taken by Mr. Pagin to Chicago for use in preparation for the trial of the defendants upon this indictment; and that Mr. Durand was sent by him to Chicago to explain to the United States Attorney at Chicago these tables. The evidence showed that these tables were brought to Chicago by Mr. Pagin and turned over to the United States Attorney; Mr. Pagin leaving Washington on the evening of October 17th. Mr. Garfield testified that compilations from these tables, showing the uniformity in the percentages of purchases of live stock by the different defendant packing companies, and the import thereof as tending to show combination among the packers in the purchases of live stock, was the subject of discussion between him and Mr. Meeker, one of the defendants, at an interview in the office of the Commissioner in December, 1904, at which Mr. Meeker was asked by the Commissioner with respect thereto and answered the same. Commissioner Garfield also testified that he had had conferences with the Solicitor General and Attorney General in the summer of 1904 regarding this investigation and the powers of the bureau, and that the matter of turning over to the Department of Justice the information secured in progress of the investigation was involved in the conference with the Attorney General in September, 1904. Mr. Garfield testified that the special agents of the Bureau of Corporations, engaged in obtaining information from the defendants and in the examination of the books and records of the defend-

ants, were also engaged in obtaining information respecting the matters covered by the investigation from outside sources, and made reports to the bureau, and certain of them included in their reports the names of persons who might be witnesses upon the subject-matter of a combination between the packers.

Under date of August 16, 1904, the United States Attorney at Chicago wrote the Attorney General with reference to obtaining testimony in the "Beef Trust Case," and suggested that he ask the Commissioner of Corporations to give the United States Attorney such additional information as he had upon the subject and request his employés then in Chicago to call upon him and furnish such information as they might have. This letter was communicated to the Commissioner of Corporations, and under date of August 22, 1904, the Commissioner transmitted to the acting Attorney General a memorandum of the names of certain persons from whom the United States Attorney "may be able to obtain statements regarding the allegations that the injunction in the Beef Trust Case is being violated." This memorandum contained the names of some 30 persons and firms. Mr. Garfield testified that these names were obtained by his agents from sources outside of the defendants, but that he did not know personally where his agents got the names, but that it was made up from files in his office; and the testimony of a witness on behalf of defendants, an employé of Swift & Co. who furnished information to the agents of the Bureau of Corporations at their request therefor and upon the direction of his employer, was that four of the names upon this list were given by him to Mr. Carroll, one of the special agents of the Bureau of Corporations engaged in such investigation, at the request of Mr. Carroll. Mr. Garfield also testified that in January, 1905, he turned over to the United States Attorney for said district a similar list of names of persons as witnesses who claimed they knew of alleged facts regarding a combination among the defendants, which list was obtained in the same manner from the agents of the Bureau.

Upon the conclusion of the testimony a motion was entered on behalf of the defendants that the court direct the jury peremptorily to find the issues for the defendants. A cross-motion was also entered on behalf of the United States that the court direct a verdict for the government.

William H. Moody, Atty. Gen., and Charles B. Morrison, U. S. Atty., and Asst. U. S. Attys. Hanchett and Godman.

John S. Miller and A. R. Urion, for defendants Armour & Co., Armour Packing Co., J. Ogden Armour, Patrick A. Valentine, Arthur Meeker, Thomas J. Connors, Samuel McRoberts, and Charles W. Armour.

William J. Hynes and Louis C. Ehle, for defendants Swift & Co., Louis F. Swift, Edward F. Swift, Charles H. Swift, Lawrence A. Carton, D. Edwin Hartwell, Albert H. Veeder, Robert C. McManus, and Arthur F. Evans.

John C. Cowin, Brode Davis, and Moritz Rosenthal, for defendants Cudahy Packing Co. and Edward A. Cudahy.

George W. Brown and M. W. Borders, for defendants Fairbank Canning Co., Edward Morris, and Ira N. Morris.

HUMPHREY, District Judge (orally). A number of acts of Congress are involved in the case, and have been discussed upon the arguments on the motion and cross-motion to direct a verdict—the Cullom act, the original interstate commerce act of February 4, 1887 (24 Stat. 379, c. 104), and amendments of March 2, 1889 (25 Stat. 855, c. 382), and February 10, 1891 (26 Stat. 743, c. 128, [U. S. Comp. St. 1901, p. 3154]); the act with regard to testimony of February 11, 1893 (27 Stat. 443, c. 83 [U. S. Comp. 1901, p. 3173]), being supplemental to the Cullom act; the act establishing the Department of

Commerce and Labor of 1903 (Act Feb. 14, 1903, c. 552, 32 Stat. 825 [U. S. Comp. St. Supp. 1905, p. 63]), and by its terms adopting certain portions of the two first-named acts; the Sherman act (the anti-trust law of 1890); and Appropriation Act Feb. 25, 1903, c. 755, 32 Stat. 904 [U. S. Comp. St. Supp. 1905, p. 602]. The defendants are indicted under the Sherman act (the anti-trust act), charged with a conspiracy in restraint of trade. They have pleaded that as to them that act is suspended and inoperative and does not exist, because they were compelled to furnish evidence of and concerning the matters contained in the indictment, and that under the law such furnishing of evidence gives them immunity. The question of guilt or innocence is not involved.

As to the corporations, the artificial persons named as defendants, the pleas cannot avail. I regard that contention as having been met and overruled by the late decision of the Supreme Court in the case of Edwin F. Hale v. William Henkel, United States Marshal, 26 Sup. Ct. 370, 50 L. Ed. ——, decided March 12, 1906, and not yet officially reported. In the typewritten decision of that case forwarded to the Attorney General and by him presented to the court I find the following language:

"But it is further insisted that, while the immunity statute may protect individual witnesses, it would not protect the corporation of which appellant was the agent and representative. This is true, but the answer is that it was not designed to do so. The right of a person under the fifth amendment to refuse to incriminate himself is purely a personal privilege of the witness. It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person. A privilege so extensive might be used to put a stop to the examination of every witness who was called upon to testify before the grand jury with regard to the doings or business of his principal, whether such principal were an individual or a corporation. The question whether a corporation is a "person" within the meaning of this amendment really does not arise, except, perhaps, where a corporation is called upon to answer a bill of discovery, since it can only be heard by oral evidence in the person of some one of its agents or employés. The amendment is limited to a person who shall be compelled in any criminal case to be a witness against himself, and, if he cannot set up the privilege of a third person, he certainly cannot set up the privilege of a corporation. As the combination or conspiracies provided against by the Sherman anti-trust act can ordinarily be proved only by the testimony of parties thereto, in the person of their agents or employés, the privilege claimed would practically nullify the whole act of Congress. Of what use would it be for the Legislature to declare these combinations unlawful, if the judicial power may close the door of access to every available source of information upon the subject? * * *

"If, whenever an officer or employé of a corporation were summoned before a grand jury as a witness, he could refuse to produce the books and documents of such corporation, upon the ground that they would incriminate the corporation itself, it would result in the failure of a large number of cases where the illegal combination was determinable only upon the examination of such papers. But, conceding that the witness was an officer of the corporation under investigation and that he was entitled to assert the rights of the corporation with respect to the production of its books and papers, we are of the opinion that there is a clear distinction in this particular between an individual and a corporation, and that the latter has no right to refuse to submit its books and papers for an examination at the suit of the state. The individual may stand upon his constitutional rights as a citizen. He is entitled to carry on his private business in his own way. His power to contract is unlimited. He owes no duty to the state or to his neighbors to divulge his business

142 F.—52

or to open his doors to an investigation so far as it may tend to criminate him. He owes no such duty to the state, since he receives nothing therefrom beyond the protection of his life and property. His rights are such as existed by the law of the land long antecedent to the organization of the state, and can only be taken from him by due process of law and in accordance with the Constitution. Among his rights are a refusal to incriminate himself and the immunity of himself and his property from arrest and seizure except under a warrant of the law. He owes nothing to the public so long as he does not trespass upon their rights.

"Upon the other hand, the corporation is a creature of the state. It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises, and holds them subject to the laws of the state and the limitations of its charter. Its powers are limited by law. It can make no contract not authorized by its charter. Its rights to act as a corporation are only preserved to it so long as it obeys the laws of its creation. There is a reserved right in the Legislature to investigate its contracts and find out whether it has exceeded its powers. It would be a strange anomaly to hold that a state, having chartered a corporation to make use of certain franchises, could not in the exercise of its sovereignty inquire how these franchises had been employed and whether they had been abused, and demand the production of the corporate books and papers for that purpose. The defense amounts to this: That an officer of a corporation, which is charged with a criminal violation of the statute, may plead the criminality of such corporation as a refusal to produce its books. While an individual may lawfully refuse to answer incriminating questions unless protected by an immunity statute. it does not follow that a corporation, vested with special privileges and franchises, may refuse to show its hand when charged with an abuse of such privileges.

"It is true that the corporation in this case was chartered under the laws of New Jersey, and that it receives its franchises from the Legislature of that state; but such franchises, so far as they involve questions of interstate commerce, must also be exercised in subordination to the power of Congress to regulate such commerce, and in respect to this the general government may also assert a sovereign authority to ascertain whether such franchises have been exercised in a lawful manner, with a due regard to its own laws. Being subject to this dual sovereignty, the general government possesses the same right to see that its own laws are respected as the state would have with respect to the special franchises vested in it by the laws of the state. The powers of the general government in this particular in vindication of its own laws are the same as if the corporation had been created by an act of Congress. It is not intended to intimate, however, that it has a general visitatorial power over state corporations."

I regard this as clearly distinguishing between the corporation and the individual who is an officer of the corporation. I cannot understand the opinion in any other way except as holding that there can be no immunity for the corporation, but that the officer or agent of the corporation, if the facts bring him within the purview of t..e law, may plead such immunity. This disposes of the corporations.

Now, as to the individual defendants: There is a provision in the commerce and labor act providing for immunity, and it refers for the immunity to the Cullom act and the act supplemental thereto. The commerce and labor act reads:

"All the requirements, obligations, liabilities, and immunities imposed or conferred by said 'Act to regulate commerce,' and by 'An act in relation to testimony before the Interstate Commerce Commission,' and so forth, approved February eleventh, eighteen hundred and ninety-three, supplemental to said 'Act to regulate commerce,' shall also apply to all persons who may be subpœnaed to testify as witnesses or to produce documentary evidence in pursuance of the authority conferred by this section." Act Feb. 14, 1903, c. 552, § 6, 32 Stat. 827 [U. S. Comp. St. Supp. 1905, p. 68].

The act supplementary to the Cullom act has an immunity clause in the following words:

"But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, documentary or otherwise, before said commission, or in obedience to its subpœna, or the subpœna of either of them, or in any such case or proceeding." Act Feb. 11, 1893, c. 83, 27 Stat. 443 [U. S. Comp. St. 1901, p. 3173].

Appropriation Act Feb. 25, 1903, c. 755, § 1, 32 Stat. 904 [U. S. Comp. St. Supp. 1905, p. 602], for the enforcement of the Cullom act, the Sherman act, and the Wilson act, exempts from prosecution persons giving testimony in the following language:

"Provided, that no person shall be prosecuted or be subjected to any penalty or forfeiture for, or on account of any transaction, matter or thing concerning which he may testify, or produce evidence documentary or otherwise, in any proceeding, suit or prosecution under said act."

It is necessary to look into the purposes of Congress in passing the commerce and labor act in order that the court may determine what construction will best carry out the legislative intent. It is the duty of the court in construing an act to give it such construction as will carry out the legislative purpose expressed in the act itself. It is clear to my mind that the primary purpose of the commerce and labor act was to enable Congress, by information secured through the work of officers charged with the execution of that law, to pass such remedial legislation as might be found necessary. I regard this as the primary purpose, the chief purpose, a legislative purpose. It is clear from the act itself that, if there be a secondary purpose, the primary purpose, the legislative purpose, was vastly more important in the mind of Congress than any other. Congress wanted to know how the laws with regard to corporations were operating, how they were being evaded, how to strengthen them, in case they needed strengthening. In my judgment, the purpose of every one of these laws, the high aim of Congress in passing them, was a determined purpose that the corporation, the creature of the law, should not be allowed to grow beyond the law. The commerce and labor act is the repeated attempt of Congress to bring to its aid such information as would enable Congress to do whatever might be necessary for the control of corporations. Perhaps a secondary purpose was the punishment of offenders. It is perfectly clear to my mind that this was not the main purpose, because there were abundant laws already on the statute books for that, and a great department skilled in the work of punishing offenders. And still I am not able to say but that a secondary purpose of the commerce and labor act might have been the punishment of offenders. And I say this because it is not inconsistent with the act, or with the declared primary purpose, that this should be done so far as the corporation itself is concerned. This is made pretty clear by the late decision in the Hale Case. If the statute is to be so construed as to carry out the legislative purpose, viz., secure information for the use of Congress, how can that best be done?

The statute itself surrounds the Commissioner with no forms, puts no legislative limits upon his methods, gives him unusual latitude as

to methods. It does not require public hearings. I am of opinion that the act contemplated that he should proceed by private hearings, because it provides in express terms that the President shall decide how much of his investigation shall become public. If the Commissioner should have public hearings, the President would have no chance to perform that portion of the work which the act assigns to him. I therefore conclude that the legislative mind intended that the Commissioner should proceed by private hearings. The powers of the Commissioner of Corporations are defined in section 6 of the act of February 14, 1903 (32 Stat. 827, c. 552 [U. S. Comp. St. Supp. 1905, p. 68]), and are as follows:

"The said Commissioner shall have power and authority to make, under the direction and control of the Secretary of Commerce and Labor, diligent investigation into the organization, conduct, and management of the business of any corporation, joint stock company or corporate combination engaged in commerce among the several States and with foreign nations excepting common carriers subject to 'An act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, and to gather such information and data as will enable the President of the United States to make recommendations to Congress for legislation for the regulation of such commerce, and to report such data to the President from time to time as he shall require; and the information so obtained or as much thereof as the President may direct shall be made public.

"In order to accomplish the purposes declared in the foregoing part of this section, the said Commissioner shall have and exercise the same power and authority in respect to corporations, joint stock companies and combinations subject to the provisions hereof, as is conferred on the Interstate Commerce Commission in said 'Act to regulate commerce' and the amendments thereto in respect to common carriers so far as the same may be applicable, including the right to subpoena and compel the attendance and testimony of witnesses and the production of documentary evidence and to administer oaths. All the requirements, obligations, liabilities, and immunities imposed or conferred by said 'Act to regulate commerce' and by 'An act in relation to testimony before the Interstate Commerce Commission,' and so forth, approved February eleventh, eighteen hundred and ninety-three, supplemental to said 'Act to regulate commerce,' shall also apply to all persons who may be subpoenaed to testify as witnesses or to produce documentary evidence in pursuance of the authority conferred by this section.

"It shall also be the province and duty of said bureau, under the direction of the Secretary of Commerce and Labor, to gather, compile, publish, and supply useful information concerning corporations doing business within the limits of the United States as shall engage in interstate commerce or in commerce between the United States and any foreign country, including corporations engaged in insurance, and to attend to such other ·duties as may be hereafter provided by law."

It will be observed that this section by reference gives to the Commissioner of Corporations the same powers with respect to other interstate corporations as the Cullom act and its amendments give to the Interstate Commerce Commission over common carriers so far as the same shall be applicable. These additional powers are contained in section 12 of the amended Cullom act (Act Feb. 4, 1887, c. 104, 24 Stat. 383 [U. S. Comp. St. 1901, p. 3162]), and are as follows:

"Sec. 12. (As amended March 2, 1889 [25 Stat. 858, c. 382, § 3], and February 10, 1891 [26 Stat. 743, c. 128]). That the Commission hereby created shall have authority to inquire into the management of the business of all common carriers subject to the provisions of this Act, and shall keep itself informed as to the manner and method in which the same is conducted,·and shall have the right

to obtain from such common carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created; and the Commission is hereby authorized and required to execute and enforce the provisions of this act; and, upon the request of the Commission, it shall be the duty of any district attorney of the United States to whom the Commission may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of this act and for the punishment of all violations thereof, and the costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States; and for the purposes of this act the Commission shall have power to require, by subpœna, the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation.

"Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpœna the Commission, or any party to a proceeding before the Commission, may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of books, papers, and documents under the provisions of this section.

"And any of the Circuit Courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpœna issued to any common carrier subject to the provisions of this act, or other person, issue an order requiring such common carrier or other person to appear before said Commission (and produce books and papers if so ordered) and give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. The claim that any such testimony or evidence may tend to criminate the person giving such evidence shall not excuse such witness from testifying; but such evidence or testimony shall not be used against such person on the trial of any criminal proceeding."

Section 6 of the commerce and labor act also by its terms provides that persons testifying or producing evidence before the Commissioner shall be entitled to the immunities conferred by the act in relation to testimony before the Interstate Commerce Commission, of February 11, 1893, called the "Supplemental Act." This act contains the following provision:

"But no person shall be prosecuted or subjected to any penalty or forfeiture for, or on account of, any transaction, matter or thing concerning which he may testify, or produce evidence documentary or otherwise before said Commission, or in obedience to its subpœna, or the subpœna of either of them, or in any such case or proceeding."

All of these immunity acts are relied upon by the individual defendants, and, while expressed in slightly varying language, they all mean the same thing, and each of them is a substitute for the privilege contained in that clause of the fifth amendment to the Constitution, reading:

"Nor shall any person be compelled in any criminal case to be a witness against himself."

This fifth amendment deals with one of the most cherished rights of the American citizen, and has been construed by the courts to mean that the witness shall have the right to remain silent when questioned upon any subject where the answer would tend to incriminate him. Congress by the immunity laws in question, and by each of them, has taken away the privilege contained in the amendment, and it is

conceded in argument that this cannot be done without giving to the citizen by way of immunity something as broad and valuable as the privilege thus destroyed. We are not without authority on this question. By a previous act, Congress undertook to take away the constitutional privilege by giving the citizen an equivalent, and the Supreme Court held in the case of Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110, that the substitute so given was not an equivalent. Then, at various times, the immunity acts in question were passed by Congress with full knowledge that in furnishing a substitute for this great right of the citizen, it must give something as broad as the privilege taken away. It might be broader, but it could not be narrower.

Now, in my judgment, the immunity law is broader than the privilege given by the fifth amendment, which the act was intended to substitute. The privilege of the amendment permits a refusal to answer. The act wipes out the offense about which the witness might have refused to answer. The privilege permits a refusal only as to incriminating evidence. The act gives immunity for evidence of or concerning the matter covered by the indictment, and the evidence need not be self-incriminating. The privilege must be personally claimed by the witness at the time. The immunity flows to the witness by action of law and without any claim on his part. Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819; Hale v. Henkel (recently decided) 26 Sup. Ct. 370, 50 L. Ed. ——; State v. Quarles, 13 Ark. 307, quoted in 142 U. S. 567, 12 Sup. Ct. 199 (35 L. Ed. 1110); People v. Sharp, 107 N. Y. 427, 14 N. E. 319, 1 Am. St. Rep. 851; Brown v. Walker, approved in Lamson v. Boyden, 160 Ill. 613, 620, 621, 43 N. E. 781; People v. Butler, St. Foundry, 201 Ill. 236, 248, 66 N. E. 349.

I am further of opinion that the immunity given by the act must be as broad as the liabilities imposed by the act. The act calls upon the citizen to answer any "lawful requirement" of the Commissioner. "Require" means to ask of right and by authority. Webster's Dictionary. Tenn. Coal Co. v. Waller (C. C.) 37 Fed. 545, 547. Anything is a requirement by a public officer which brings home to the person called upon that the officer is there officially and desires compliance. "Demand" and "require" are synonyms. Miller v. Davis, 88 Me. 454, 34 Atl. 265. The citizen may be punished for refusal to answer such lawful requirement. I am of opinion that when the Commissioner of Corporations, who has power to compel, makes his demand, it is the duty of the witness to obey.

The contention has been made that in order to get immunity the citizen shall wait until the compulsion becomes irresistible. That is the effect of the government contention. I am not able to bring my mind to accept that doctrine. If I am right in saying that immunity flows from the law, without any claim on the part of the defendant —and at different times that has been conceded here in argument— then no act of any kind on his part which amounts to a claim of immunity, which amounts to setting up a claim of immunity, is demanded by the law. The law never puts a premium on contumacy. A person does not become a favored citizen by resistance to a lawful

requirement.   On the contrary, the policy of the law favors the willing giving of evidence whenever an officer entitled to make a demand makes it upon a citizen who has no right to refuse.   And it would be absurd and un-American to favor the citizen who resists and places obstacles in the way of the government as against the citizen who, with a full knowledge of the law, obeys without resistance the demand of an officer who has the legal right to make the demand for something which the citizen has no legal right to refuse.   This, then, is the proposition to which we are led:   When an officer, who has a legal right to make a demand, makes such demand upon a citizen, who has no legal right to refuse, and that citizen answers under such conditions, he answers under compulsion of the law.

Is that the situation here?   Was there compulsion in this case, or were the defendants volunteers?   There is so little dispute here about the facts that perhaps it is not necessary to discuss them at all.   I am of opinion that the conference between Mr. Garfield, Mr. Krauthoff, Mr. McRoberts, and Mr. Dawes is the important matter, the important event, which fixes the character of condition under which this evidence was given.   There is some little dispute.   It may be said that Mr. Garfield is an interested witness, as a representative of the government.   It may be said that Mr. McRoberts and Mr. Krauthoff, they being at the time in the employ of the Armour Company, and one of them being now a defendant, are interested witnesses.   But there is little, if any, dispute, perhaps only on one subject, between Garfield and Dawes, only as to the oath, as to the fact that the oath was discussed.   They agree in substance on every other proposition.   Garfield says there was no discussion of the oath.   Mr. Dawes agrees with Krauthoff and McRoberts that there was.   I am not able to look at the evidence which was furnished in this case as being the voluntary production of these defendants.   The character of such parts of it as I deemed the most important is such that it absolutely dispels any thought of that kind from my mind.   Reasoning naturally, reasoning upon the natural course which men in like condition would have taken, I am led to the conclusion that the defendants would have withheld that information if they could.

It is contended that they were volunteers because they higgled with Garfield at times, debated, resisted, gave less than he first asked, withheld some.   The record does show this, but the fact remains that every approach was made by the government.   In no instance did the defendants go to Garfield offering anything.   Garfield made his demands, made them explicit, made them definite, and it does not to my mind destroy the character of compulsion under which they acted that the defendants, after having considered the law, and after having made up their minds that they had no legal right to resist, still debated with the Commissioner in the hope of inducing him to minimize his demands and take something less than he had originally demanded.   This in some instances was done.   Garfield came to them.   They did not go to him.   He demanded in writing, and through his accredited representatives; and I would not regard it as proper to hold him for any actions of his representatives, the result of which did not flow straight

to him, through them, from the defendants. But, so far as such results did flow straight to him in answer to his demands, they were negotiations between him and the defendants on his legal demands, which they had no right to dispute, or refuse to answer. He came to the defendants and presented them with the law. He held up before them his power as Commissioner. The defendants knew the law. They had been fully advised. They took further time after his first interview, and were advised further. They saw that the Martin resolution, under the eighth section of the law, made Garfield's duty imperative. After the passage of that resolution the defendants saw that Garfield was compelled to act, compelled to demand, and they were compelled to answer.

I regard Garfield as having been under the strictest legal compulsion by the terms of the Martin resolution. It may be said that he could have gone somewhere else and got his information. The record shows that he himself said that he could not; that he could not make the investigation imposed upon him as a legal duty by the Martin resolution and the eighth section of the law without getting it from these people. And the investigation itself disclosed that they are the authors of nearly one-half of all the business in their line in the whole country. So that I think he was compelled to demand from them, as well as they were compelled to answer, under this statute and resolution. Now, if the defendants volunteered nothing, but gave only what was demanded by an officer who had the right to make the demand, and gave it in good faith under a sense of legal compulsion, I am of opinion that they are entitled to immunity under the act.

But it is insisted by the government that they did not give under compulsion, because they did not give under what is known in the law as testimonial compulsion; and it is argued that testimonial compulsion means compulsion furnished by the subpœna and oath. I can add nothing to what has been adduced by way of argument here on those subjects. The subpœna is not necessary where the person is present in court or within the verge of the court. Goodpaster v. Voris, 8 Iowa (8 Clarke) 334, 74 Am. Dec. 313; Leckie v. Scott, 10 La. 412. So the rule is the same as to the production of documents. Hunton v. H. & H. Co. (Mich.) 76 N. W. 1041; Starr v. Mayer, 60 Ga. 546. The only object of the subpœna is to secure the attendance. It is superfluous when he is present without subpœna. U. S. v. Sanborn (C. C.) 28 Fed. 299, at page 302, per Mr. Justice Gray; Eastman v. Sherry (C. C.) 37 Fed. 844, 845, per Jenkins, J.; Farmer v. Storer, 11 Pick. (Mass.) 241. "Lex neminem cogit ad vana seu inutilia." Land Co. v. Peck, 112 Ill. 408, 439. Under the judiciary act, providing for allowance "to the witnesses summoned in any court of the United States," it was held that the fees of a witness who attended at the request of the United States attorney without having been summoned, were taxable. U. S. v. Williams, 1 Cranch, C. C. 178, Fed. Cas. No. 16,709; Prouty v. Draper, 2 Story, 199, Fed. Cas. No. 11,447; Whipple v. Cumberland Cotton Mfg. Co., 3 Story, 84, Fed. Cas. No. 17,-515; Hathaway v. Roach, 2 Woodb. & M. 63, 73, Fed. Cas. No. 6,213, approved by Gray, Circuit Justice, in U. S. v. Sanborn (C. C.) 28 Fed. 301. So a witness who attends without subpœna attends "pursu-

ant to law." U. S. v. Sanborn (C. C.) 28 Fed. 299, 302; Hanchett ·v. Humphrey (C. C.) 93 Fed. 895–897; U. S. v. Bell (C. C.) 81 Fed. 830; St. Matthews Bank v. Fidelity Co. (C. C.) 105 Fed. 161. I am clearly of opinion that the best judgment to be had from all of the authorities is that the subpœna is a useless and superfluous thing after the tribunal and the witnesses are together. And I am also of opinion that under any of these acts in question, these immunity laws, the production of books and papers would be legal evidence without the oath of any person, when they are adduced as showing admissions against interest and against the party producing them.

Upon the authority in the cases of Bram v. U. S., 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568, and Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, legal compulsion does not depend upon subpœna or oath, and upon reason this must be so. Books and documents prove themselves, when produced for the purpose of showing admissions against interest. They are receivable as evidence in all courts against the party producing them. The oath is not always essential to testimony. Osborne v. Detroit (C. C.) 32 Fed. 36. No oath is essential to the compulsion to produce documents in a witness' possession. A person who is required to produce documents in his possession, and produces them, need not be sworn in order to get from him the documents. Perry v. Gibson, 1 Ad. & Ell. 48; Id., 3 Nev. & M. 462 (K. C. B.); Davis v. Dale, 1 M. & M. 514; Simpson v. Smith, 1 Starkie on Ev. 161, note (n); Summers v. Moseley, 2 Cromp. & Mees. 477; 3 Wigmore, § 1894, note 1. Further, the oath may be waived, and is waived by failing to insist on it or raise the objection. Moore v. State, 96 Tenn. 209, 33 S. W. 1046; Goldsmith v. State, 32 Tex. Cr. R. 112, 22 S. W. 405; Birch v. Somerville, 2 Ir. Law R. N. S. 243; Richards v. Hugh, 51 L. J. Q. B. 361; Cady v. Norton, 14 Pick. (Mass.) 236; Slauter v. Whitelock, 12 Ind. 338; State v. Hope, 100 Mo. 347, 13 S. W. 490, 8 L. R. A. 608; State v. Smith (Iowa) 100 N. W. 40, 42. Books and papers produced by these defendants as the books and records of their business, and called for as such, are evidence against them, without any oath. If I am right in the proposition that the immunities given by the act are as broad as the liabilities imposed by the act, then the subpœna and the oath were not essential. Garfield could make a legal requirement without using either the subpœna or the oath. I think this is clear from the language of the act. If the Commissioner could make a legal demand without a subpœna, then immunity would follow to the witness answering without a subpœna. It is true that section 6 of the commerce and labor act of February 14, 1903 (32 Stat. 827, c. 552 [U. S. Comp. St. Supp. 1905, p. 68]) says that immunity shall apply to all persons "who may be subpœnaed," etc. Now it would be absurd to say that a person subpœnaed would have immunity if he produced no evidence, and, as the subpœna alone cannot give immunity, so the lack of that alone cannot take it away.

The same argument will apply to the oath. The purpose of the oath was to secure the truth. That is always the purpose of the oath. That is the only purpose of the oath; and, to be certain that we get the truth, the court always starts out by putting the witness under oath. But the act under which Garfield was clothed with power did not re-

quire him to put anybody under oath. It required him to make investigation. He might make it according to legal forms or not. He might use any kind of evidence that he chose that was suitable to his purpose. The evidence procured from these defendants, so far as it consisted of books and papers, was, however, legal evidence—would be considered legal evidence in a court of law; and under any one of these acts the production of the books and papers is a complete compliance with the law providing for the production of evidence, documentary or otherwise. It is not strange that Garfield was satisfied not to swear the defendants, although he started out with that intention. He distinctly told them so, and his forms show that fact. He expected to put them on oath if he regarded it as necessary, if he had any doubt about the truthfulness of the evidence. He had access to the books of original entry. He was satisfied of that fact. His agents were satisfied of that fact. The record shows this over and over again by repeated answers, and there was not the slightest reason for putting anybody under oath, so far as the use of those books and documents was concerned. The oath of any one would have made that evidence no stronger or better than it is now without the oath.

If it shall be said that the act of February 14, 1903, establishing the Department of Commerce and Labor, allows immunity to the witness only upon the conditions urged by the government, viz., that he shall have resisted until regularly subpœnaed and sworn, no such contention can fairly be made as to the immunity clause of the act of February 25, 1903. The record shows, and it is not disputed, that material evidence was procured by Garfield from the defendants upon the subject of an unlawful combination. I have already held that it was given under legal compulsion. The record further shows that this evidence was demanded by the Department of Justice for the purposes of this prosecution, and that Garfield declined to give it, as he had promised the defendants it would not be so used; that later, upon repeated demands of the Department of Justice, and upon the order of the President, he turned it over to that department. It is contended that as to all such evidence the defendants are entitled to immunity under the independent and unconditional act of February 25, 1903, and I am of opinion that they are so entitled.

It is contended on behalf of the government that the construction here given to the the commerce and labor law would result in the failure to convict individuals for the prosecution of whom the Commissioner of Corporations might be assisting, and thus the law would be nullified; that guilty persons would rush to the officer with their evidence and receive immunity. The answer to this contention is that the primary purpose of the act is to correct defective legislation, and, if an additional purpose be the prosecution of offenders, such additional purpose is clearly secondary. To effect the primary purpose, viz., secure information for the use of the legislative body, the construction here given would be highly efficient, as the persons required to give evidence, being personally immune, would probably testify willingly, while those coming unbidden would be volunteers and not entitled to immunity. I am also presented with the argument that the questions are of great public interest. Therefore the defendants should be held

to trial, to the end that upon a final judgment, if adverse to the defendants, the questions arising on the pleas might be reviewed by the Supreme Court, which would not be possible if the decision be adverse to the government. I know that courts have sometimes yielded to this argument in cases of public importance, usually where property rights only were involved; but I think it should not be the controlling motive for the decision here. The parties are entitled to the best judgment of the court upon the questions involved. I am of opinion that the record shows the individual defendants to have given under legal compulsion evidence of and concerning the matters contained in the indictment, and that they are therefore entitled to immunity.

Gentlemen of the jury, under the law of this case, the immunity pleas filed by the defendants will be sustained as to the individual defendants, the natural persons, and denied as to the corporations, the artificial persons, and your verdict will be in favor of the defendants as to the individuals, and in favor of the government as to the corporations.