377 U.S. 95 (1964)
UNITED STATES
v.
WELDEN.
No. 235.
Supreme Court of United States.
Argued February 27, 1964.
Decided April 20, 1964.
APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS.
Irwin A. Seibel argued the cause for the United States. With him on the brief were Acting Solicitor General Spritzer, Assistant Attorney General Orrick and Robert B. Hummel.
George H. Lewald argued the cause for appellee. With him on the brief were Edward B. Hanify and Alan D. Hakes.
MR. JUSTICE GOLDBERG delivered the opinion of the Court.
This appeal presents the question of whether a person who has testified under subpoena before a congressional committee investigating the operation of the Antitrust Acts has testified in a "proceeding, suit, or prosecution under said Acts" thereby acquiring immunity from prosecution *96 under the Act of February 25, 1903, 32 Stat. 854, 904.[1]
The facts are undisputed. On September 6, 1962, appellee, along with other individuals and corporations, was indicted on charges of conspiring to fix milk prices and to defraud the United States, in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, and the Conspiracy Act, 62 Stat. 701, 18 U. S. C. § 371. Appellee moved to dismiss the indictment on the ground, inter alia, that the prosecution was barred under the immunity provision of the Act of February 25, 1903, because he had previously testified before a subcommittee of the House Select Committee on Small Business concerning matters covered by the indictment. The Government opposed the motion to dismiss contending that the immunity provision of the Act of February 25, 1903, extends only to judicial proceedings and not to hearings before congressional committees.[2] The District Court for the District of Massachusetts, rejecting the Government's contention, dismissed the indictment against appellee. The Government appealed the dismissal directly to this Court pursuant to the Criminal Appeals Act, 62 Stat. 844, as amended, 18 U. S. C. § 3731. Probable jurisdiction was noted. 375 U. S. 809.
We hold, for the reasons stated below, that the immunity provision of the Act of February 25, 1903, applies only to persons testifying in judicial proceedings, not to persons testifying before committees or subcommittees of Congress.
The immunity provision in question was enacted as part of an appropriations act which declared:
"That for the enforcement of the provisions of the Act entitled `An Act to regulate commerce,' *97 approved February fourth, eighteen hundred and eighty-seven, and all Acts amendatory thereof or supplemental thereto, and of the Act entitled `An Act to protect trade and commerce against unlawful restraints and monopolies,' approved July second, eighteen hundred and ninety, and all Acts amendatory thereof or supplemental thereto, and sections seventy-three, seventy-four, seventy-five, and seventy-six of the Act entitled `An Act to reduce taxation, to provide revenue for the Government, and other purposes,' approved August twenty-seventh, eighteen hundred and ninety-four, the sum of five hundred thousand dollars, to be immediately available, is hereby appropriated, out of any money in the Treasury not heretofore appropriated, to be expended under the direction of the Attorney-General in the employment of special counsel and agents of the Department of Justice to conduct proceedings, suits, and prosecutions under said Acts in the courts of the United States: Provided, That no person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit, or prosecution under said Acts. . . ." 32 Stat. 903-904. (Emphasis added.)
By any common-sense reading of this statute, the words "any proceeding, suit, or prosecution under said Acts" in the proviso plainly refer to the phrase "proceedings, suits, and prosecutions under said Acts in the courts of the United States," in the previous clause. The words "under said Acts" confirm that the immunity provision is limited to judicial proceedings, which are brought "under" specific existing acts, such as the Sherman Act or the Commerce Act. Congressional investigations, although they may relate to specific existing acts, are not *98 generally so restricted in purpose or scope as to be spoken of as being brought "under" these Acts.[3]
In Hale v. Henkel, 201 U. S. 43, decided only three years after the passage of the Act of February 25, 1903, this Court construed that Act in accordance with the plain meaning of its words as follows:
"While there may be some doubt whether the examination of witnesses before a grand jury is a suit or prosecution, we have no doubt that it is a `proceeding' within the meaning of this proviso. The word should receive as wide a construction as is necessary to protect the witness in his disclosures, whenever such disclosures are made in pursuance of a judicial inquiry, whether such inquiry be instituted by a grand jury, or upon the trial of an indictment found by them." Id., at 66. (Emphasis added.)
We conclude, therefore, that as enacted the Act of February 25, 1903, applies only to judicial proceedings.[4]
*99 Appellee does not really dispute this. His basic contention, which is not accepted by any member of the Court,[5] is that the 1906 immunity statute[6] amended the Act of February 25, 1903, to extend immunity to persons who testified in nonjudicial as well as judicial proceedings. He does not contend that the 1906 statute, by its terms, so amended the 1903 Act. He offers the following interpretation of the events leading up to the enactment of the 1906 statute in support of the contention that the 1903 Act was amended by implication to extend to non-judicial proceedings. In the case of United States v. Armour & Co., 142 F. 808, decided three years after the enactment of the 1903 Act, the United States District Court for the Northern District of Illinois held that certain defendants had been immunized from prosecution under the Antitrust Laws by giving unsubpoenaed and unsworn testimony in a nonjudicial investigation conducted *100 by the Commissioner of Corporations,[7] an official of the Department of Commerce and Labor.[8] Congressional reaction to this decision was immediate and adverse, and within four months Congress enacted the 1906 immunity statute.[9] This statute specifically limited immunity under existing immunity statutes to persons testifying under oath and in obedience to subpoena.[10] Appellee contends that the purpose of Congress in enacting the 1906 statute was to remedy the objectionable features of the Armour decision, and that since the statute did not "remedy" the court's holding that immunity could be obtained by testifying in a nonjudicial proceeding, it follows that Congress did not regard that holding as objectionable. He asks us to conclude, therefore, that *101 "proceeding" as used in the immunity provision of the Act of February 25, 1903, must now be read to include nonjudicial as well as judicial proceedings.
This argument erroneously assumes that the Armour decision rested on a construction of "proceeding, suit, or prosecution" in the immunity provision of the Act of February 25, 1903. A reading of that decision reveals, however, that it rested primarily on the Commerce and Labor Act, which contained a specific grant of immunity to persons who testified in investigations, admittedly nonjudicial, conducted by the Commissioner of Corporations.[11] In deciding the Armour case, the court felt it *102 "necessary to look into the purposes of Congress in passing the commerce and labor act in order that the court may determine what construction will best carry out the legislative intent." 142 F., at 819. After a detailed analysis of that statute and its history, the court concluded that the Commerce and Labor Act was dispositive of the case and that defendants were entitled to immunity thereunder. Following this conclusion, the judge added a brief paragraph in which he said, without analyzing (or even quoting) the language or history of the Act of February 25, 1903, that he was "of opinion" that the defendants would also be entitled to immunity under that Act as well. Id., at 826.[12] In the very next paragraph, *103 however, the judge again described the opinion as resting on "the construction here given to the commerce and labor law . . . ." Ibid.
The controversial feature of the Armour decision, and the only one which Congress was interested in remedying, was the holding that unsubpoenaed and unsworn testimony came within "the purposes of Congress in passing the commerce and labor act . . . ." 142 F., at 819. Congress wanted to be certain that persons anticipating indictment could not immunize themselves from prosecution by volunteering to give unsworn testimony.[13] There was nothing controversial about the court's holding that immunity could result from testimony given in an investigation conducted by the Commissioner of Corporations, since the Commerce and Labor Act specifically granted immunity for testimony given in such an investigation.
It is not at all significant, therefore, that Congress, while "remedying" the Armour holding that immunity could be obtained from testimony which was unsworn and voluntary, did not "remedy" the holding that immunity could result from testimony given in nonjudicial investigations conducted by the Commissioner of Corporations.
*104 Congress, in enacting the 1906 statute, did not manifest any intent to enlarge the reach of the immunity provision of the Act of February 25, 1903, to include nonjudicial proceedings. The purpose of the 1906 statute was not to define the type of proceeding in which immunity, under existing statutes, could be obtained. Its sole purpose was to define the type of testimony for which immunity, under existing statutes, could be obtained. This is all Congress was asked to do by President Theodore Roosevelt in his message recommending the legislation which became the 1906 statute. In his message the President said:
"It has hitherto been supposed that the immunity conferred by existing laws was only upon persons who, being subpoenaed, had given testimony or produced evidence . . . .
.....
"But Judge Humphrey [the district judge who decided the Armour case] holds that if the Commissioner of Corporations (and therefore if the Interstate Commerce Commission), in the course of any investigations prescribed by Congress, asks any questions of a person, not called as a witness, or asks any questions of an officer of a corporation, not called as a witness, with regard to the action of the corporation on a subject out of which prosecutions may subsequently arise, then the fact of such questions having been asked operates as a bar to the prosecution of that person or of that officer of the corporation for his own misdeeds. Such interpretation of the law comes measurably near making the law a farce, and I therefore recommend that the Congress pass a declaratory act stating its real intention." H. R. Doc. No. 706, 59th Cong., 1st Sess.
The limited purpose of the 1906 Act is also apparent from the response made by Senator Knox, the manager of the *105 bill which became the 1906 Act,[14] to a statement made by Senator Daniel, a critic of immunity legislation. Senator Daniel said:
"I suppose that the bill under consideration as it reads now applies only to persons who testify in a judicial proceeding or to those who are responding to some body such as a Congressional committee that has the right to enforce an answer from a witness.[15]
.....
"I should like very much to hear from the patron of this bill some statement as to the present state of the law and as to the benefits to be derived from the bill."
Senator Knox responded as follows:
"Mr. President, the purpose of this bill is clear, and its range is not very broad. It is not intended to cover all disputed provisions as to the rights of witnesses under any circumstances, except those enumerated in the bill itself. . . .
.....
"Mr. President, the whole purpose of this bill is to define the right of the witness as we thought it was defined in the statute which I have read, and to say, as the statute said, but to say it even more clearly and emphatically, that the immunity shall *106 only extend to witnesses who have been subpoenaed to produce books and papers or subpoenaed to give testimony. The essence of the whole act is found in lines 18, 19, and 20, on page 2, which read that these immunity provisionsonly the immunity provisions under the interstate commerce act and under the Commerce and Labor act, not the general immunity that the citizen enjoys in judicial proceedings, but merely in relation to the proceedings of these two great bureaus of the Government`shall extend only to a natural person.' That is, that a corporation is not to have the benefit of the immunity provisions, but they`shall extend only to a natural person who, in obedience to a subpoena, gives testimony under oath or produces evidence, documentary or otherwise, under oath.' " 40 Cong. Rec. 7657-7658.[16]
This Court in United States v. Monia, 317 U. S. 424, 429-430, recognized that "the sole purpose" of the 1906 statute was to limit immunity to persons "who, in obedience to a subpoena, testified or produced evidence under oath," so that the decision whether or not to grant immunity would be that of the appropriate "Government officials," rather than of private citizens anticipating indictment.[17]
*107 We conclude, therefore, that the 1906 statute did not, either expressly or implicitly, extend the immunity provision of the Act of February 25, 1903, to include non-judicial proceedings. The 1906 Act simply limited immunity to persons testifying under oath and in response to subpoena.
Our decision today is based solely on the language and legislative history of the relevant congressional enactments. Congress has extended immunity, with careful safeguards, to persons testifying before congressional committees in certain limited situations not here involved.[18] Where Congress, however, has limited immunity to persons testifying in judicial proceedings, as it has plainly done here, it is not for the courts to extend the scope of the immunity.
The District Court erred, therefore, in holding that appellee's testimony before a congressional subcommittee had immunized him from prosecution. The judgment dismissing the indictment is reversed and the case remanded for proceedings in conformity with this opinion.
It is so ordered.
MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.
The appellee was indicted for conspiracy[1] and violation of § 1 of the Sherman Act[2] shortly after he had *108 appeared and testified about the alleged violation before a Committee of Congress in obedience to its subpoena. The District Court dismissed the indictment on the ground that the prosecution was barred by the Antitrust Immunity Act of February 25, 1903,[3] as amended in 1906.[4] The Immunity Act provides:
". . . no person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit, or prosecution under said [Interstate Commerce or Antitrust[5]] Acts . . . ."
The 1903 Act was amended in 1906 so as to limit its application "only to a natural person who, in obedience to a subpoena, gives testimony under oath or produces evidence, documentary or otherwise, under oath." The Court holds that the word "proceeding" in the 1903 Act "applies only to persons testifying in judicial proceedings." This narrow and grudging interpretation of the Act is, in my judgment, not justified by either the language or the history of the legislation.
The Court appears to find much comfort for its holding in the Act's language appropriating funds to the Attorney General for the employment of special counsel and agents of the Department of Justice "to conduct proceedings, suits, and prosecutions under said [Interstate Commerce or Antitrust] Acts in the courts of the United *109 States." The Immunity Act itself was appended to the appropriation language following the word "Provided." But the appropriation provision was merely utilized as a legislative vehicle for passage of the substantive Immunity Act in the form of a proviso. The language after the word "Provided" is a separate and distinct immunity enactment, itself part of an immunity program enacted by Congress in 1903 in order to aid in the enforcement of the Antitrust Acts by compelling witnesses to testify upon this broad statutory promise of immunity by the Government.[6] This immunity provision of the 1903 enactment is complete in itself, independent of the appropriation provision. In fact, so independent is the immunity provision, that in the codification of the statute, 15 U. S. C. § 32, the appropriation provision has been dropped altogether, making the majority's effort to limit the immunity provision's language by that of the appropriation provision even more strained. Therefore the 1903 Act, as amended in 1906, clearlyunless the meaning of its language is to be amended by judicial decreestands as a lasting obligation upon the Government to give complete immunity to a witness who testifies "in obedience to a subpoena . . . under oath," not merely in a "suit, or prosecution under said Acts" but "in any proceeding. . . under said [Interstate Commerce or Antitrust] Acts." The word "proceeding," broad enough to include testimony before a grand jury, Hale v. Henkel, 201 U. S. 43, is also broad enough to include testimony given under oath in obedience to a subpoena before any federal agency or legislative committee investigating antitrust violations.
*110 The historical setting of the 1903 Immunity Act shows, I think, beyond any shadow of a doubt, that the word "proceeding" was deliberately chosen in order to provide a grant of immunity for testimony concerning antitrust violations given before investigatory agencies that were wholly nonjudicial. During the month of February 1903, Congress also passed an Act, including provisions for immunity, which established the Department of Commerce and Labor and conferred upon the Commissioner of Corporations (an official of the Department of Commerce and Labor) the investigatory powers possessed by the Interstate Commerce Commission. 32 Stat. 825, 828. See also 32 Stat. 847, 848. Soon after the 1903 legislation was passed, officers of Armour & Company testified voluntarily before the Commissioner of Corporations concerning antitrust violations. The company and the officers were later indicted by a federal grand jury for violation of the Sherman Act. United States District Judge Humphrey in 1905, in United States v. Armour & Co., 142 F. 808 (D. C. N. D. Ill.), directed a verdict for the individual defendants on the ground that the Antitrust Immunity Act of February 25, 1903, gave individuals who testified before the Commissioner of Corporations complete immunity from prosecution. The district judge held that this immunity was granted both by that Act (the Act here in question) and by the Commerce and Labor Act of 1903, supra. As to the applicability of the Act before us, he said:
"If it shall be said that the act of February 14, 1903, establishing the Department of Commerce and Labor, allows immunity to the witness only upon the conditions urged by the government, viz., that he shall have resisted until regularly subpoenaed and sworn, no such contention can fairly be made as to the immunity clause of the act of February 25, *111 1903. . . . It is contended that . . . the defendants are entitled to immunity under the independent and unconditional act of February 25, 1903, and I am of opinion that they are so entitled."[7]
Judge Humphrey held that both the Commerce and Labor Act and the Antitrust Immunity Act now before us granted complete immunity. His holding as to the latter Act cannot be dismissed, as the Court attempts to do, by calling it "dictum."
The subsequent legislative treatment of the Antitrust Immunity Act of 1903 supports Judge Humphrey's holding that the complete immunity which that Act granted was not limited to testimony given in judicial proceedings only. The part of Judge Humphrey's opinion that caused great concern to the Government was his holding that witnesses obtained complete immunity from prosecution based on their testimony even though they had not been subpoenaed or put under oath. This concern prompted President Theodore Roosevelt to send a message to Congress requesting that the law be amended in this respect. The President's message specifically showed that he did not want to take away the immunity of witnesses who testified or produced documentary evidence, but simply wanted the law to grant immunity only to witnesses who appeared under subpoena and testified under oaththat is, those who were compelled to testify. Showing that this was his only objection to Judge Humphrey's holding, the President in his message told the Congress:
"It is of course necessary, under the Constitution and the laws, that persons who give testimony or produce evidence as witnesses should receive immunity from prosecution."[8]
*112 Without at all attempting to limit the kinds of "proceeding" in which the witness can earn the promised immunity, Congress followed the President's suggestion and provided in the 1906 amendment to the 1903 Immunity Act now before us that the immunity would apply only to individuals testifying in obedience to subpoena and under oath. After thorough scrutiny of the Armour decision, Congress, agreeing with President Roosevelt, made no move to change the part of the holding which stated flatly that the antitrust immunity provision of the Act of February 25, 1903, applied to witnesses testifying before the Commissioner of Corporations, and so was not limited to "judicial proceedings." And this part of the Armour holding did not pass unnoticed, for Congressman Littlefield, who presented to the House of Representatives the Attorney General's request for an amendment to the Antitrust Immunity Act, told the House:
"Perhaps I ought to say that, in my judgment, the legislation upon which Judge Humphrey largely based his ruling was not the act relating to interstate commerce, under which the Interstate Commerce Commission acts, nor the act creating the Bureau of Corporations, under which the Commissioner of Corporations acts, but probably the resolution appropriating $500,000, which contained a very broad and loosely drawn provision in relation to immunity. I am not authorized to say upon what the judge based his decision; but having read what he did say, it is rather my judgment that he was controlled in his conclusion very largely by the language contained in that appropriation, which was, in my judgment, very much broader than is found in the interstate-commerce act or in the act creating the Department of Commerce and Labor."[9]
*113 And in the Senate debate on the 1906 amendment, Senator Daniel expressed an understanding which no one questioned:
"I suppose that the bill under consideration as it reads now applies only to persons who testify in a judicial proceeding or to those who are responding to some body such as a Congressional committee that has the right to enforce an answer from a witness."[10]
Senator Knox, the manager of the amendment in the Senate, thereupon explained the bill to Senator Daniel in detail, never contradicting what Senator Daniel had said on this point. Neither Congressman Littlefield, Senator Daniel, Senator Knox, nor any other member of Congress suggested altering the Armour holding that the Antitrust Immunity Act of 1903 was not limited to judicial proceedingsnone, in fact, ever questioned itbecause that holding, it may fairly be inferred, correctly read the intent of an almost identical Congress in passing the Act three years earlier.[11]
From that day until this no one seems ever to have doubted that this reading of the 1903 Antitrust Immunity Act was correct. In fact, in 1942 this Court obviously read the statute the same way in United States v. Monia, 317 U. S. 424. Monia and another claimed complete immunity under that Act as amended in 1906 because they had testified before a federal grand jury inquiring into alleged violations of the federal antitrust laws. The Act *114 was fully considered in the majority opinion by Mr. Justice Roberts and in the dissenting opinion of Mr. Justice Frankfurter. Not only was there in that case no intimation that the immunity provided in the Act was for testimony given before judicial agencies only, but both opinions went on a precisely opposite assumption. In holding that the Act gave immunity even to a witness who had not asserted his Fifth Amendment privilege against being compelled to testify against himself, Mr. Justice Roberts speaking for the Court treated the 1903 Act before us as covering the same kinds of "proceedings" as the immunity provisions of the Interstate Commerce Act, as amended in 1893,[12] which gave a complete immunity for testimony given before the Commission. Moreover, in his detailed dissent Mr. Justice Frankfurter referred at length to the immunity provisions contained in various statutes establishing governmental agencies both before and after the passage of the 1903 Act, such as the Securities Act,[13] the Public Utility Holding Company Act,[14] the Motor Carrier Act,[15] the Fair Labor Standards Act,[16] and various others. 317 U. S. 424, 431. Surely all these were not cited in the belief that the 1903 Act related to testimony given before judicial bodies only. It is plain beyond doubt that they were referred to on the assumption that the 1903 Act granted whatever immunity it did, not merely for testimony given before judicial bodies, but for testimony given before all the various governmental agencies that subpoena witnesses to give evidence before them on antitrust matters.
The Antitrust Immunity Act of 1903 was passed at a time when the fear of prosecution was making testimony *115 from witnesses often impossible to obtain and thereby impeding enforcement of the antitrust laws. It was passed by a Congress friendly to those laws, not to frustrate but to help enforce them.[17] Whether it was a wise or, in the case of an unwilling witness, constitutionally legitimate[18] means for Congress to use in seeking that goal is not the issue in this case. Wise or unwise, it was a solemn promise made by Congress which I think the Government should keep, just as I thought that the Government should have been compelled to keep a solemn promise of immunity made by the Secretary of the Treasury in Shotwell Mfg. Co. v. United States, 371 U. S. 341, 367 (dissenting opinion). The very fact that the Court must labor so long and hard to reach its result is in my judgment strong evidence that that result should not have been reached, for I think that when the Government makes an obligation in broad terms on which individuals have a reasonable right to rely, it should not seek to have all doubts resolved in its own favor against the private citizens who have taken it at its word. Important as I believe the antitrust laws to be, I believe it is more important still that there should be no room for anyone to doubt that when the Government makes a promise, it keeps it. Cf. Federal Power Comm'n v. Tuscarora Indian Nation, 362 U. S. 99, 124 (dissenting opinion).
I would affirm the judgment.
MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.
I am inclined to construe this Immunity Act more in harmony with its literal language than is the Court; *116 and the reasons I do so are in part those stated by Mr. JUSTICE BLACK and in part the nature of the modern congressional committee. The trial-nature of the modern investigating committee argues strongly for a construction of this Act that gives immunity to one subjected to scrutiny and probing under the full glare of today's hearing methods.
Congressional investigations as they have evolved, are in practice "proceedings" of a grave nature so far as individual liberties are concerned. Not all committee hearings are "trials" of the witness; not all committee hearings are televised or broadcast; and so far as appears this witness was not subjected to any such ordeal.[1] But the problem with which we deal concerns not a particular committee nor a particular hearing but the generalized meaning of "proceeding" as used in the Act of February 25, 1903.
Courts cannot enjoin a committee from questioning a witness anymore than they can enjoin passage of a palpably unconstitutional bill. See Nelson v. United States, 93 U. S. App. D. C. 14, 208 F. 2d 505. But courts, knowing the manner in which committees often operate, are properly alert either in denying legal effect to what has been done or in taking other steps protective of the rights of the accused.[2] See Nelson v. United States, 93 U. S. App. D. C., at 22, 208 F. 2d, at 513. That is one reason why I would not import any ambiguities into this Immunity Act to the disadvantage of the accused.
The present investigation was in my view a "proceeding, suit, or prosecution" under the antitrust laws within *117 the meaning of the Act of February 25, 1903. The House Committee before which Welden testified was trenching on the same ground as the present antitrust prosecution. Its power to proceed derived of course from the Legislative Reorganization Act of 1946, 60 Stat. 812, the Rules and Regulations of the House, or a Special Resolution. The power to investigate extends to the manner in which laws are being administered and to the need for new laws. Watkins v. United States, 354 U. S. 178, 187. The questions put by the House Committee were allowable, as they clearly were, only because they pertained to the manner in which the antitrust laws were operating or to the need for more effective laws. They were therefore "under" the antitrust laws.
We have repeatedly said that a congressional investigation which exposes for exposure's sake or which is "conducted solely for the personal aggrandizement of the investigators or to `punish' those investigated is indefensible." Watkins v. United States, 354 U. S., at 187. Congress is not a law enforcement agency; that power is entrusted to the Executive. Congress is not a trial agency; that power is entrusted to the Judiciary. Some elements of a "fair" hearing are provided by Committee Rules (Yellin v. United States, 374 U. S. 109); some by constitutional requirements. By reason of the First Amendment Congress, being unable to abridge freedom of speech or freedom of the press, may not probe into what a witness reads (cf. United States v. Rumely, 345 U. S. 41), or why a publisher chose one editorial policy rather than another. Since by reason of the First Amendment Congress may make no law "prohibiting the free exercise" of religion, it may not enter the field through investigation and probe the minds of witnesses as to whether they go to church or to the confessional regularly, why they chose this church rather than that one, etc. By reason of the Self-Incrimination Clause of the Fifth Amendment, witnesses *118 may refuse to answer certain questions. See Quinn v. United States, 349 U. S. 155; Emspak v. United States, 349 U. S. 190; Bart v. United States, 349 U. S. 219.
There are other limitations. "The Senate, for instance, could not compel a witness to testify in a Senate investigation whose sole and avowed purpose was to determine whether a particular federal official should be impeached, since only the House can impeach. The House could not force a witness to testify in a House investigation whose sole and avowed purpose was to decide the guilt of a person already impeached, or to determine whether or not a treaty should be ratified, since the Constitution entrusts these functions to the Senate. Neither House could conduct an investigation for the sole and avowed purpose of determining whether an official of the State of New York should be impeached, since that determination is reserved to the Legislature of that State." Snee, Televising Congressional Hearings, 42 Geo. L. J. 1, 9 (1953).
In these and other related ways, congressional committees are fenced in. Yet in the view of some of us the tendency has been to trench on First Amendment rights. See Braden v. United States, 365 U. S. 431; Wilkinson v. United States, 365 U. S. 399; Barenblatt v. United States, 360 U. S. 109; Gibson v. Florida Legislative Comm., 372 U. S. 539. There was a time when a committee, knowing that a witness would not answer a question by reason of the Fifth Amendment, would not put the question to him. Today, witnesses who invoke the Fifth Amendment at the threshold have been minutely examined, apparently to see how many times they can be forced to invoke it.[3] Hearings have indeed often become a spectacle,[4] *119 some of the reasons being succinctly stated by the experienced Chairman of the Senate Committee on Government Operations, and head of the Permanent Committee on Investigations, Senator McClellan of Arkansas:
"First let me say that the primary purpose and actually the only legitimate purpose for such hearings must be a legislative purpose, but out of that also flows the opportunity to disseminate information of great value and advantage to the public. Because the public of course is interested in legislation and upon what you premise itupon what is the need for it. It all fits in. Now my position has been, and there are those, who, I'm sure, disagree with me, when we hold a public hearing it is public. Those who have the opportunity, who can conveniently at some times attend in person and witness everything that occursthe press is present to make a reporting on what occursradio is there to disseminate the information as it is producedI can see no good reason for barring television. That too is a media of communication, and in my judgment sometimes is the most effective, next to actually being present in person and witnessing what has occurred. So I have always felt that if the press is to be present, radio coverage is to be given, the television is entitled to the same privileges. I do think that the lights being on is a distractionI think the lights should be turned off and we have always observed that except where a man is simply taking the *120 fifth amendment. If he's taking the fifth amendment and reading from a card, the light helps him to see to read the script on the card and I don't see any reason to turn them off."[5]
A strong case has been made for holding these "spectacles" to be out of bounds:
"1. The use of these publicity media bears no real and substantial relation to any legitimate purpose of a congressional investigating committee. Yet, it constitutes a substantial restraint upon the liberty of an unwilling witness. Hence to force him to testify before these media exceeds the constitutional bounds of the investigating power; the attempt to do so, and a fortiori punishment under R. S. 102 (1875), 2 U. S. C. § 192 (1946 ed.) is therefore a denial of substantive due process under the Fifth Amendment.
"2. The use of these media creates an atmosphere in which it is normally unfair to compel the testimony of an unwilling witness, and in which rights guaranteed by the Constitution are placed in jeopardy. Hence to use these media, without reasonable necessity, constitutes a denial of procedural due process under the same Amendment."[6]
President Truman condemned "spectacles" of that kind. His specific objection was directed to the televised hearings by the Kefauver Committee in 1951:
"The President is most seriously concerned. The trouble with television, he said, is that a man is held before cameras and 40,000,000 people more or less *121 hear him charged with so and so, and the public, untrained generally with evaluating the presentation of evidence, is inclined to think him guilty just because he is charged.
"It is the very negation of judicial process, with the committee acting as prosecutor and defense and the public acting as the jury."[7]
Alan Barth reviewed the nature of the "legislative trial":
"The legislative trial carries with it sanctions of a severe order. It is, to begin with, unimpeded by any *122 statute of limitations; an error committed in the 1930s may be judged in the 1950sand without any allowance whatever for altered conditions or a changed political climate. Defendants may be subjected to double or triple jeopardy, that is, they may be tried by different committees for the same deed. The punishments meted out are uninhibited by any sort of criminal code. Persons convicted in the courts of Congress may not suffer imprisonment, but they are likely to be subjected, in addition to loss of reputation, to a black-listing which may effectively deny them any means of gaining a livelihood."[8]
Barth goes on to say:
"The legislative trial serves three distinct though related purposes: (1) it can be used to punish conduct which is not criminal; (2) it can be used to punish supposedly criminal conduct in the absence of evidence requisite to conviction in a court of law; and (3) it can be used to drive or trap persons suspected of `disloyalty' into committing some collateral crime such as perjury or contempt of Congress, which can then be subjected to punishment through a judicial proceeding."[9]
Benjamin V. Cohen has shown why the legislative trial has no place in our system:
"There is no excuse for congressional committees acting as `people's courts' following totalitarian patterns.
"Legislative trials, since the trial of Socrates, have had an odious history. Legislative trials combine the functions of prosecutor and judge and deny to the accused the right to impartial and independent judgment. Legislative trials are subject *123 to the influence of partisanship, passion and prejudice. Legislative trials are political trials. Let us remember that in the past legislative justice has tended to degenerate into mob injustice."[10]
The legislative "trial" is a phenomenon that Senator Cain once described as a committee "running wild," becoming "victims of a wave of emotion which they created, but over which they had no control."[11]
Some may see wisdom in this modern kind of "trial by committee," so to speak, with committees and prosecutors competing for victims. But the more I see of the awesome power of government to ruin people, to drive them from public life, to brand them forever as undesirable, the deeper I feel that protective measures are needed. I speak now not of constitutional power, but of the manner in which a statute should be read. I therefore incline to construe the Immunity Act freely to hold that he who runs the gantlet of a committee cannot be "tried" again.
NOTES
[1] The relevant portion of this Act is set forth on pp. 96-97.
[2] The Government concedes that the testimony given before the subcommittee related to matters charged in the indictment.
[3] Congressional hearings are generally conducted under the Legislative Reorganization Act of 1946, 60 Stat. 812, under the rules or regulations of either House, or, as in the present case, under a special resolution. H. Res. 51, 86th Cong., 1st Sess., 105 Cong. Rec. 1785.
[4] This Act, as codified, appears at 15 U. S. C. § 32. The codification, which has not been enacted into positive law, eliminates the appropriation provision of the Act which by its terms was of no effect after June 30, 1904. The codification makes no other change. 61 Stat. 638, 1 U. S. C. § 204 (a), declares that the United States Code establishes "prima facie the laws of the United States, general and permanent in their nature . . . Provided, however, That whenever titles of such Code shall have been enacted into positive law the text thereof shall be legal evidence of the laws therein contained, in all the courts . . . ." This Court, in construing that statute has said that "the very meaning of `prima facie' is that the Code cannot prevail over the Statutes at Large when the two are inconsistent." Stephan v. United States, 319 U. S. 423, 426. Even where Congress has enacted a codification into positive law, this Court has said that the

"change of arrangement, which placed portions of what was originally a single section in two separated sections cannot be regarded as altering the scope and purpose of the enactment. For it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." Fourco Glass Co. v. Transmirra Corp., 353 U. S. 222, 227, quoting Anderson v. Pacific Coast S. S. Co., 225 U. S. 187, 198-199.
Certainly where, as here, the "change of arrangement" was made by a codifier without the approval of Congress, it should be given no weight. "If construction [of a section of the United States Code which has not been enacted into positive law] is necessary, recourse must be had to the original statutes themselves." Murrell v. Western Union Tel. Co., 160 F. 2d 787, 788. Accordingly, in order to construe the immunity provision of the Appropriations Act of February 25, 1903, we must read it in the context of the entire Act, rather than in the context of the "arrangement" selected by the codifier.
[5] See dissenting opinion of MR. JUSTICE BLACK, post, at 113, note 11.
[6] The text of the 1906 statute is set forth infra, note 9.
[7] This conclusion was reached after the taking of testimony. Accordingly, the Government could not appeal the trial court's directed verdict of acquittal.
[8] The Armour case arose before the creation of independent Departments of Labor and of Commerce.
[9] The full text of the 1906 Act is as follows.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That under the immunity provisions in the Act entitled `An Act in relation to testimony before the Interstate Commerce Commission,' and so forth, approved February eleventh, eighteen hundred and ninety-three, in section six of the Act entitled `An Act to establish the Department of Commerce and Labor,' approved February fourteenth, nineteen hundred and three, and in the Act entitled `An Act to further regulate commerce with foreign nations and among the States,' approved February nineteenth, nineteen hundred and three, and in the Act entitled `An Act making appropriations for the legislative, executive, and judicial expenses of the Government for the fiscal year ending June thirtieth, nineteen hundred and four, and for other purposes,' approved February twenty-fifth, nineteen hundred and three, immunity shall extend only to a natural person who, in obedience to a subpoena, gives testimony under oath or produces evidence, documentary or otherwise, under oath." 34 Stat. 798, 15 U. S. C. § 33.
[10] See discussion of these events in United States v. Monia, 317 U. S. 424, 428-429.
[11] "An Act to establish the Department of Commerce and Labor" provided in relevant part:

"In order to accomplish the purposes declared in the foregoing part of this section, the said Commissioner shall have and exercise the same power and authority in respect to corporations, joint stock companies and combinations subject to the provisions hereof, as is conferred on the Interstate Commerce Commission in said `Act to regulate commerce' and the amendments thereto in respect to common carriers so far as the same may be applicable, including the right to subpoena and compel the attendance and testimony of witnesses and the production of documentary evidence and to administer oaths. All the requirements, obligations, liabilities, and immunities imposed or conferred by said `Act to regulate commerce' and by `An Act in relation to testimony before the Interstate Commerce Commission,' and so forth, approved February eleventh, eighteen hundred and ninety-three, supplemental to said `Act to regulate commerce,' shall also apply to all persons who may be subpoenaed to testify as witnesses or to produce documentary evidence in pursuance of the authority conferred by this section." 32 Stat. 825, 828.
The Act of February 11, 1893, provides in relevant part:
"That no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpoena of the Commission, whether such subpoena be signed or issued by one or more Commissioners, or in any cause or proceeding, criminal or otherwise, based upon or growing out of any alleged violation of the act of Congress, entitled, `An act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, or of any amendment thereof on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission, or in obedience to its subpoena, or the subpoena of either of them, or in any such case or proceeding: Provided, That no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying." 27 Stat. 443-444.
[12] Although Congressman Littlefield referred to this dictum in the debate on the House version of the bill, 40 Cong. Rec. 8738, he did not intimate that the 1903 Act was applicable to congressional investigations or that the purpose of the 1906 Act was to make it so applicable. On the contrary, Congressman Littlefield stated that the sole purpose of the Act was to limit immunity to subpoenaed and sworn testimony. He specifically said, moreover, that the 1906 Act and the Acts which it amended were intended to apply only to a "criminal prosecution . . . [and to investigations conducted by] the Interstate Commerce Commission . . . or by the Commissioner of Corporations . . . ," and that the 1906 Act was intended to assure that no "person shall have the power to offer immunity to a witness except the Government of the United States or some officer acting in behalf thereof." Id., at 8739. This language, in its context, would not seem to include members or Committees of Congress. See also H. R. Rep. No. 3797, 59th Cong., 1st Sess. Furthermore, even if we were to assume arguendo that the Armour decision was based on a construction of the Act of February 25, 1903, we would be hesitant to accept appellee's argument that the failure of Congress to overrule that construction resulted in an amendment by implication. Amendments by implication, like repeals by implication, are not favored. See 1 Sutherland, Statutory Construction (3d ed.) 365-366 (citing cases). As this Court said in Jones v. Liberty Glass Co., 332 U. S. 524, 534: "We do not expect Congress to make an affirmative move every time a lower court indulges in an erroneous interpretation. In short, the original legislative language speaks louder than such judicial action."
[13] See United States v. Monia, supra, at 429.
[14] The Senate version of the bill prevailed in conference and was adopted. See H. R. Rep. No. 5049, 59th Cong., 1st Sess.
[15] Senator Daniel's supposition that the 1906 Act "applies" to congressional committees was probably based on the erroneous assumption that the 1906 Act, in addition to amending the Acts to which it made specific reference, see note 9, supra, also amended 12 Stat. 333 which provided that: "the testimony of a witness examined and testifying before either House of Congress, or any committee of either House of Congress, shall not be used as evidence in any criminal proceeding against such witness in any court of justice . . . ." This statute was superseded in 1954 by 68 Stat. 745, 18 U. S. C. § 3486.
[16] Although the 1906 amendment referred to the Act of February 25, 1903, along with other immunity statutes, in limiting immunity to persons testifying under oath and in response to subpoena, Senator Knox was correct in suggesting that the Amendment would have little, if any, application to judicial testimony which is commonly sworn and subpoenaed.
[17] In Monia, which involved a grand jury investigation, the appropriate "Government officials" were the Attorney General and his subordinates. In Armour the appropriate government official was the Commissioner of Corporations. Congress may of course designate its own members as appropriate officials, as it has in fact done in certain limited situations not here involved, see note 18, infra.

It is true that the Monia opinion, with regard to the issue raised in that case, considered the 1903 Act as having the same effect as the Interstate Commerce Act. The issue in that case was whether a witness was required to claim his privilege against self-incrimination as a condition of obtaining immunity. It is undisputed that the 1906 Act standardized the rules relating to the types of testimony which would be privileged under the Interstate Commerce Act, the Commerce and Labor Act, and the Act of February 25, 1903. The 1906 Act did not, however, standardize (or alter) the types of proceedings in which immunity could be obtained.
[18] See Immunity Act of 1954, 68 Stat. 745, 18 U. S. C. § 3486.
[1] 62 Stat. 701, 18 U. S. C. § 371.
[2] 26 Stat. 209, as amended, 15 U. S. C. § 1.
[3] 32 Stat. 854, 904, 15 U. S. C. § 32.
[4] 34 Stat. 798, 15 U. S. C. § 33.
[5] The Acts with respect to which immunity from prosecution was given are the Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. §§ 1-27, 41-43, 301-327, the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1-7, and the antitrust provisions of the Wilson Tariff Act of 1894, §§ 73-76, 28 Stat. 509, 570, as amended, 15 U. S. C. §§ 8-11.
[6] See also the identical immunity provisions in the Commerce and Labor Act of February 14, 1903, § 6, 32 Stat. 825, 828, incorporating by reference Compulsory Testimony Amendment of 1893 to the Interstate Commerce Act, 27 Stat. 443, 49 U. S. C. § 46, and in the Elkins Amendment to the Interstate Commerce Act, Act of February 19, 1903, § 3, 32 Stat. 847, 848, 49 U. S. C. §§ 41-43.
[7] 142 F., at 826.
[8] Message of the President, H. R. Doc. No. 706, 59th Cong., 1st Sess., p. 2.
[9] 40 Cong. Rec. 8738.
[10] 40 Cong. Rec. 7657 (emphasis supplied).
[11] I agree with the Court that Congress in the 1906 statute did not "manifest any intent to enlarge the reach of the immunity provision of the Act of February 25, 1903, to include nonjudicial proceedings." Ante, p. 104. But the Act of 1903, as pointed out above, clearly applied to nonjudicial proceedings without any enlargement; it was never limited to judicial "proceedings," but granted complete immunity to witnesses who testified before governmental agencies other than those that could be called judicial.
[12] 27 Stat. 443, 49 U. S. C. § 46.
[13] 48 Stat. 74, 87, 15 U. S. C. § 77v (c).
[14] 49 Stat. 803, 832, 15 U. S. C. § 79r.
[15] 49 Stat. 543, 550, 49 U. S. C. § 305 (d).
[16] 52 Stat. 1060, 1065, 29 U. S. C. § 209.
[17] See 36 Cong. Rec. 411-419. The provision was not debated in the Senate. See id., 989-990.
[18] Compare Ullmann v. United States, 350 U. S. 422, 440 (dissenting opinion).
[1] Respondent's testimony before the Committee appears in Hearings, Special Subcommittee of the House Select Committee on Small Business, 86th Cong., 2d Sess., pursuant to H. Res. 51, Pt. IV, pp. 665-700.
[2] For analogous instances of the alertness of the Court to protect an accused against the effect of pretrial publicity, see Irvin v. Dowd, 366 U. S. 717; Rideau v. Louisiana, 373 U. S. 723.
[3] See Hearings before Senate Committee on Rules and Administration on Financial or Business Interests of Officers or Employees of the Senate, 88th Cong., 1st and 2d Sess., pp. 1337-1363 (Robert G. Baker); Hearings before Senate Select Committee on Improper Activities in the Labor or Management Field, 85th Cong., 1st Sess., pp. 1511-1578, 1654-1684, 2038-2047, 2374-2405 (Dave Beck); Beck v. Washington, 369 U. S. 541, 583-587 (dissenting opinion).
[4] Barth, Government by Investigation (1955), p. 81; Rogge, The First and the Fifth (1960), p. 204; American Bar Association, Report on Congressional Investigations (1954).
[5] Metropolitan Broadcasting, "Opinion in the Capital," Interview with Senator John McClellan, March 1, 1964. For a like defense of televised hearings see Senator Kefauver, 97 Cong. Rec. 9777 et seq.
[6] Snee, Televising Congressional Hearings, 42 Geo. L. J. 1, 2-3 (1953).
[7] White House Press Release, as quoted by Chicago Daily News, June 27, 1951, p. 49, col. 5, and quoted in Snee, supra, note 6, at 2.

Congressman Magee said in 97 Cong. Rec. A1145: ". . . there is no more reason for televising crime investigations than there is in televising criminal trials. Of necessity, many of our criminal cases develop lurid and obscene testimony. Some of it is unfit to put in public print. Certainly it is unfit to go out over the air waves. Many witnesses would despair at the thought of testifying when they were being viewed by television. It is bad enough for a timid witness to face a small courtroom of spectators; but it would be far worse if that person knew that he or she was being spied upon by television addicts all over the Nation. Certainly it would not be conducive to clear thought or expression. I cannot feel that the courts will ever force witnesses to subject themselves to this needless procedure. To me the whole idea is inane and repulsive. It would bring the Congress to a new low level in public esteem. The dignity of the courtroom would become only a memory while its sacred portals became a testing ground for the future Faye Emersons and Jimmie Durantes." And see Gossett, Justice and TV, 38 A. B. A. J. 15 (1952); Yesawich, Televising & Broadcasting Trials, 37 Cornell L. Q. 701 (1952); Arnold, Mob Justice and Television, 12 Fed. Com. B. J. 4 (1951); Klots, Trial by Television, Harper's, October 1951, 90; Report of the Special Committee on Televising and Broadcasting, 77 Rep. A. B. A., p. 607 et seq. (1952).
Telecasting and broadcasting of committee hearings are banned by the House. See 98 Cong. Rec. 1334-1335, 1443, 1567-1571, 1689-1691, 1949-1952, 5394-5395, A1152-A1153, A1176, A1180, A1196, A1227; 108 Cong. Rec. 267-269.
[8] Op. cit., supra, note 4, at 82.
[9] Id., at 83.
[10] When Men Fear to Speak, Freedom Withers on the Vine, Address, Indiana B'nai B'rith Convention, Sept. 27, 1953. See Delaney v. United States, 199 F. 2d 107, 113, where the Court of Appeals in setting aside a conviction said:

"This is not a case of pre-trial publicity of damaging material, tending to indicate the guilt of a defendant, dug up by the initiative and private enterprise of newspapers. Here the United States, through its legislative department, by means of an open committee hearing held shortly before the trial of a pending indictment, caused and stimulated this massive pre-trial publicity, on a nationwide scale. Some of this evidence was indicative of Delaney's guilt of the offenses charged in the indictment. Some of the damaging evidence would not be admissible at the forthcoming trial, because it related to alleged criminal derelictions and official misconduct outside the scope of the charges in the indictment. None of the testimony of witnesses heard at the committee hearing ran the gantlet of defense cross-examination. Nor was the published evidence tempered, challenged, or minimized by evidence offered by the accused." See Nelson v. United States, 93 U. S. App. D. C. 14, 208 F. 2d 505.
[11] 97 Cong. Rec. 9768.